In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-2302

DONNA L. LEWIS,

*Plaintiff-Appellant,*

v.

CITY OF CHICAGO and TERENCE WILLIAMS,[1]

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6050—**Ruben Castillo**, *Judge.*

---

ARGUED FEBRUARY 6, 2007—DECIDED JULY 26, 2007

---

Before KANNE, WOOD, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Plaintiff Donna Lewis is a police officer in the Chicago Police Department. She alleges sex discrimination and retaliation claims under Title VII and 42 U.S.C. § 1983 against her former supervisor Lieutenant Terence Williams, the Department and the City of Chicago. The district court granted the defendants'

---

[1] The City of Chicago is the real party in interest for claims against the Chicago Police Department and therefore we have adjusted the caption accordingly. *See Chan v. Wodnicki*, 123 F.3d 1005, 1007 (7th Cir. 1997).

motion for summary judgment on all claims. We affirm the judgment as to the *Monell* claim against the City but otherwise reverse.

## I.  HISTORY

Lewis graduated from the Chicago police academy in 1998 and began her career in the Department as a patrol officer. In 2000, she was transferred to a Tactical Unit where she was a plain clothes officer dealing regularly with drug dealers and gangs. At the Tactical Unit, the chain of command had Lewis reporting directly to a sergeant who in turn was supervised by a lieutenant. By 2002, defendant Williams was Lewis's supervising Lieutenant.

In the late summer of 2002, the Washington, D.C. police department sought assistance from various police departments, including Chicago's, in anticipation of likely demonstrations during a forthcoming International Monetary Fund meeting. Chicago's Chief of Patrol, James A. Maurer, issued a memorandum on September 11, 2002 to various units in the Department setting forth a request for volunteers and establishing a selection procedure.

Pursuant to the memorandum:

- Participating officers would travel to Washington, D.C. on Friday, September 27th, work on Saturday and Sunday, September 28th and 29th, and return to Chicago on September 30th.

- Only Tactical, Gang or Special Operations Sections officers who completed riot training in September 2002 were eligible to participate.

- Qualifying officers would need to be on either furlough or regular days off to qualify.

- Officers would receive overtime pay for the time they spent traveling and working in Washington, D.C.

The memorandum also noted that the Department might send "several hundred officers and supervisors" to the IMF rally, and "that this could serve as an excellent on-the-job training exercise" in light of a future demonstration then scheduled for Chicago in November 2002. Appellant's Appx. 885.

Additionally, the memorandum stated that, "Because of hotel accommodations, a lone female officer will not be sent since there are two (2) persons to each room. Therefore, recommend a minimum of two (2) female officers." *Id.* Despite Chief Maurer's use of the phrase "lone female officer" in the memorandum, the defendants claim that "Chief . . . Maurer intended to convey that [the Department] had a limited number of hotel rooms, so an odd number of either gender would not be chosen." Appellees' Brief at 9.

Lewis qualified for the IMF Detail and wanted to attend. She completed the necessary form and provided it to her supervisor, Sergeant Melean, in a timely fashion in compliance with the procedure established by Chief Maurer's memorandum. Her name was initially placed on the list of IMF attendees from her unit. However, Lewis's name was removed from the final list submitted from her unit and she would not go to Washington, D.C.

The defendants' explanation is that Lewis's unit did not have another qualified female officer interested in going to Washington, D.C. Lieutenant Williams determined that Lewis was the "odd woman out" and therefore removed her name from the list in conformance with Chief Maurer's memorandum.

Lewis, however, believes the defendants' explanation is hogwash. According to Lewis, she questioned Williams

about being removed from the list. Williams allegedly responded that he took her name off the list "because [she] was a female," and that "it was going to be a working trip, and he thought it would be dangerous and that [she] would thank him for it later." Appellant's Brief at 7. Williams denies making this statement.

Lewis argues that the issue of avoiding an odd number of officers for rooming purposes is a pretextual argument masking discrimination against her. She claims that a fellow qualified female officer, Officer Regan, was never informed about the IMF Detail. Thus, Lewis implies that Williams intentionally tried to prevent her from obtaining a partnering officer for the IMF Detail. Additionally, Lewis claims that other units in the Department contacted each other in an attempt to pair up single officers.

If Chief Maurer's intention was to avoid an odd number of participants of either gender on the IMF Detail for rooming purposes, the Department was unsuccessful in achieving this task. The record contains a document entitled "Fall 2002 IMF / World Bank Conference—Washington, D.C." that lists the officers who attended the IMF Detail and corresponding hotel room numbers for these officers. Appellant's Appx. 873-80. According to this list, 245 male officers and 17 female officers attended the IMF Detail in Washington, D.C. Most officers shared a hotel room with a fellow officer of the same gender. However, four officers had a room to themselves. Three of the four were male officers: Lt. Flynn in Room 338, Officer Marin in Room 363, and Officer Saez in Room 446. The fourth officer, a female, Officer Varela is listed by herself in Room 426. The record is silent as to whether there were accommodations available for three officers in a single room such as a roll-away bed.

The parties dispute whether Lewis was denied any benefit due to her absence from the IMF Detail. Lewis

argues that she lost out on approximately $1,000 in overtime earnings. She also believes that the IMF Detail was a "once in a lifetime opportunity" that would have been "great" on her resume. The defendants counter that Lewis does not point to any lost promotional opportunities. The defendants also note that Lewis was able to participate in other similar details in Chicago and Lewis did not place these details on her resume.

At the end of September 2002, Lewis filed a grievance with the union over the IMF Detail and later filed a complaint with the EEOC. She alleges that Williams retaliated against her in response to her complaints. The alleged retaliation included sending Lewis on dangerous assignments without sufficient support in violation of Department policy. She was also transferred from the Tactical Unit to a Gang Unit. The transfer, according to Lewis, was in retaliation as the Gang Unit provided her less opportunities for advancement and overtime. The transfers and disruptions also included new partners that Lewis did not know or trust leading her to believe that Williams was trying to place her in compromising and dangerous situations. Lewis also requested a transfer to the Special Operations Section but this request was denied. The Special Operations Section was not supervised by Williams. Lewis believes that Williams denied her request for a transfer in order to continue his retaliation against her. Lewis also claims that she made several complaints to various supervisors above Williams about his discrimination and retaliation. She argues that these other supervisors failed to take action and this is part of a pattern and practice in the Department to ignore discrimination claims.

Lewis is now on permanent disability leave after a fellow officer hit her in the head with a sledgehammer when she was assisting in a forced entry during a narcotics investigation. Lewis does not provide any evidence that her

injury was anything other than an accident. However, she does point out that Williams ordered her to assist the narcotics team and she also complains about the City's failure to provide her proper medical care.

## II.  ANALYSIS

"We review grants of summary judgment *de novo*." *Lummis v. State Farm Fire & Cas. Co.*, 469 F.3d 1098, 1099-1100 (7th Cir. 2006) (citing *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 475 (7th Cir. 2004); *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003)). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

### A.  *Sex Discrimination Claims as to the IMF Detail*

Lewis's claims against the City arise under Title VII and her claim against Williams is brought pursuant to § 1983. *See Fairley v. Fermaint*, 482 F.3d 897, 903-04 (7th Cir. 2007). However, we analyze Lewis's Title VII and § 1983 sex discrimination claims arising from her inability to participate in the IMF Detail in the same manner. *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 750 n.2 (7th Cir. 2006) (citing *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003)).

It is unlawful to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Thanongsinh v. Bd. of Educ., Dist. U-46*, 462 F.3d 762, 772 (7th Cir.

2006) (quoting 42 U.S.C. § 2000e-2(a)(1)). A plaintiff "can avert summary judgment 'either by putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the *McDonnell Douglas* formula.'" *Paz v. Wauconda Healthcare and Rehab. Ctr., LLC*, 464 F.3d 659, 665 (7th Cir. 2006) (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 719 (7th Cir. 2005)).

### 1.   Direct Method for Demonstrating Discrimination

The terminology in this area of law can be a bit confusing as the word "direct" is used both for the "direct method" and "direct evidence." *See Rudin*, 420 F.3d at 720 n.3. "Direct evidence," one of the two types of proof used in the direct method for establishing a triable issue of fact, is "an admission by the decision-maker that his actions were based upon the prohibited animus. Needless to say, such admissions are rarely encountered." *Rogers*, 320 F.3d at 753 (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 576 (7th Cir. 2001); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (internal quotations omitted)). Evidence used in the direct method is "not limited to near-admissions by the employer that its decisions were based on a proscribed criterion . . ., but also includes circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006) (citing *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902-03 (7th Cir. 2006); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006)). In the present case, Lewis provides both direct evidence and circumstantial evidence against the defendants sufficient to survive summary judgment under the direct method.

Lewis provides direct evidence of alleged discrimination through Williams's statement that he prevented her from participating on the IMF Detail because she was a female and that "it was going to be a working trip, and he thought it would be dangerous and that [she] would thank him for it later." Appellant's Brief at 7. This is sufficient evidence to create a genuine issue of material fact as to whether the defendants discriminated against Lewis.

The district court, however, rejected this evidence. It determined that "Williams's comment must be considered in the context in which it was made. . . . Williams's alleged statement that Lewis could not go on the IMF Detail because she is 'female' cannot be characterized as direct evidence of discrimination without a presumption that gender is completely irrelevant to the IMF Detail. [Chief Maurer's memorandum] indicates that gender was relevant to the rooming arrangements." *Lewis v. City of Chicago Police Dep't*, 428 F. Supp. 2d 783, 792-93 (N.D. Ill. 2006).

The district court erred by improperly weighing the parties' evidence during summary judgment. In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The district court should not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue for trial. *See Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001).

The record presents a swearing contest between Lewis and Williams as to Williams's alleged statement as to why he excluded Lewis from the IMF Detail. The reason for that exclusion, whether Williams had discriminatory intent or because of a legitimate non-discriminatory reason, is a question of fact for a jury to decide at trial, not

for a district court to consider at summary judgment. Lewis is a competent witness to testify because she was present when Williams made the alleged statement, it is an admission by a party-opponent and, if true, is direct evidence of discriminatory intent. FED. R. EVID. 801(d)(2); *see, e.g.*, *Stinnett v. Iron Works Gym / Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002) (noting that the evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial).

The defendants provide a secondary argument that Williams's comments must also be ignored because he was not a decision maker. Although he consulted with his supervisor, Commander Brown, the record contains evidence to demonstrate that Williams was involved in the process of determining who would be put on the IMF Detail. Therefore, Williams's comments can qualify as direct evidence of discrimination. *See Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) (explaining that a decision maker is one who is involved in the process of making the employment decision at issue).

Furthermore, a plaintiff can use *either* direct evidence, circumstantial evidence *or a combination* of the two types of evidence, to meet her burden under the direct method. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "Circumstantial evidence demonstrating intentional discrimination includes: '(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pre-

text for discrimination.'" *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (quoting *Sun v. Bd. of Tr. of Univ. of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007)). Chief Maurer's memorandum and the ultimate rooming arrangements made in Washington, D.C. provide circumstantial evidence of discrimination that Lewis can also use under the direct method.

Chief Maurer's memorandum, when viewed in the light most favorable to Lewis, does not convey a gender neutral concern in regard to hotel arrangements as suggested by the defendants. The Department has the same privacy and efficiency concerns in its rooming arrangements regardless of whether there is a lone female or lone male officer. Despite the universal nature of privacy and efficiency concerns to rooming arrangements for both genders, the memorandum uses the phrase "lone female" instead of "lone female or lone male" or "lone officer." Additionally, the defendants' argument that the Department's purpose was to avoid single officers in a hotel room does not stand up to the reality that the Department ultimately sent an odd number of male and female officers to the IMF Detail and that four lone officers, three men and one woman, had individual rooms to themselves. Lewis has provided sufficient direct and circumstantial evidence to satisfy the direct method of proof on this issue. A genuine issue of material fact exists as to whether the defendants discriminated against Lewis on the basis of her gender.

### 2.   *Evidence of Materially Adverse Employment Action*

Despite the existence of a genuine issue of material fact on one element of Lewis's claim, summary judgment is still appropriate if Lewis cannot provide evidence to support all elements of the claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *see, e.g.*, *Koszola v. Bd. of Educ. of the*

*City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (citing *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). Lewis must also demonstrate a materially adverse employment action that resulted from the alleged discrimination. *See Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) ("Whether the plaintiff proceeds by the direct or indirect method of proof, [s]he must show a materially adverse employment action.") (citing *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691 (7th Cir. 2001)).

"Although we define adverse employment action broadly, not everything that makes an employee unhappy is an actionable adverse action. For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998); *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999); *Smart v. Ball State Univ.*, 89 F.3d 437, 440 (7th Cir. 1996) (internal quotations omitted)). We have noted that materially adverse employment action can be categorized into three groups of cases involving: (1) the employee's current wealth such as compensation, fringe benefits, and financial terms of employment including termination; (2) the employee's career prospects thus impacting the employee's future wealth; and (3) changes to the employee's work conditions including subjecting her to "humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in [her] work place environment." *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002) (internal citations and quotations omitted).

The "purpose of the adverse employment action requirement is to provide a reasonable limiting principle for the

type of conduct actionable under the statute." *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006). We use the adverse employment action requirement in order to distinguish meritorious cases from "trivial personnel action[s]" brought by "irritable, chip-on-the-shoulder employee[s]." *Herrnreiter*, 315 F.3d at 745 (citations omitted). We do not condone bigotry or hatred, but we are interpreting an employment discrimination statute, not canons of individual virtue. *See Hunt v. City of Markham, Illinois*, 219 F.3d 649, 653-54 (7th Cir. 2000) (citations omitted).

Lewis's proposed adverse employment actions are the loss of two days of overtime totaling approximately $1,000 and the loss of the experience of training on the IMF Detail that she claims to be a "once in a lifetime" training event. The loss of the training opportunity dovetails into an additional argument that Lewis has also lost future employment opportunities because of her exclusion from the IMF Detail. The defendants counter that the amount of lost pay is trivial—only two days of overtime—and that Lewis had no right to the overtime. They also question the value of the IMF Detail training experience in Lewis's career as Lewis was able to participate in other large detail events and did not list these other training events on her resume.

Our circuit has not directly addressed the issue of whether a denial of overtime is an adverse employment action sufficient to implicate Title VII. We have held that a denial of a raise can be an adverse employment action while the denial of a "more transient" payment such as a bonus is not. *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 559 (7th Cir. 2007) (citing *Farrell v. Butler Univ.*, 421 F.3d 609, 614 (7th Cir. 2005); *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003); *Hunt*, 219 F.3d at 654). "The difference is that raises are a

normal and expected element of an employee's salary, while bonuses generally are 'sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer.'" *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001) (quoting *Hunt*, 219 F.3d at 654).

Depending on the type of work, overtime can be a significant and recurring part of an employee's total earnings similar to a recurring raise or it could be insignificant and nonrecurring like a discretionary bonus. The IMF Detail in Washington, D.C. in September 2002 was a one time event. However, as Chief Maurer's memorandum noted, Chicago had its own IMF meeting scheduled for November 2002. Additionally, large public gatherings requiring significant police presence are recurring events in a large city like Chicago. Lewis can construct from the evidence an argument that by denying her the opportunity to participate in the IMF Detail, she lost her ability to move forward in the component of her career of being a police officer at recurring large scale public gatherings. In turn, she can argue that she has lost the potential to earn many hours of overtime, not just the mere two days that she lost in September 2002. Consequently, we conclude that Lewis can demonstrate a genuine issue of material fact as to whether she has experienced an adverse employment action.

We must add two final points before we conclude our consideration of adverse employment actions. First, as Title VII prohibits discrimination as to compensation, terms, conditions and privileges of employment, it is the "material, sufficiently important alterations of the employment relationship" that qualify as adverse employment action. *Brewer v. Bd. of Trs. of Univ. of Illinois*, 479 F.3d 908, 916-17 (7th Cir. 2007) (citations omitted). A strict adherence to labels leads to a meaningless cry of phrases such as "bonus" or "salary" without reaching the critical

issue of whether the alleged discrimination caused a material change in the employment relationship.

Second, although the adverse employment action requirement is a limiting principle within the statute, we cannot allow the need for a limiting principle to inadvertently create a loophole for discriminatory actions by employers. Adverse employment actions should not be defined so narrowly as to give an employer a "license to discriminate." *Farrell*, 421 F.3d at 614. An employer's "actions which deprived [the employee] of compensation which [s]he otherwise would have earned clearly constitute adverse employment action for purposes of Title VII." *Bass v. Bd. of County Comm'rs, Orange County, Florida*, 256 F.3d 1095, 1118 (11th Cir. 2001); *cf. Phelan*, 463 F.3d at 780 (finding an adverse employment action when the employer terminated the employee for four months despite the fact that the employer eventually reinstated the employee and provided full back pay). We seek to avoid both "trivial personnel action[s]" brought by "irritable, chip-on-the-shoulder employee[s]," *Herrnreiter*, 315 F.3d at 745 (citations omitted), and unlawful discrimination by employers. An employer cannot discriminate against an employee and then hide behind the argument that the employee's deprivation was not material. "'[T]he 'primary objective' of Title VII 'is not to provide redress but to avoid harm.'" *Phelan*, 463 F.3d at 780 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 805-06 (1998)).

### B.  Retaliation Claim

"Title VII makes it unlawful for an 'employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice.'" *Brewer*, 479 F.3d at 923 (quoting 42 U.S.C. § 2000e-3(a)). The Supreme Court recently instructed in *Burlington N. and Santa Fe R.R. Co. v.*

*White*, that "the range of conduct prohibited under [Title VII's anti-retaliation] provision is broader than Title VII's [anti-]discrimination provision." *Phelan*, 463 F.3d at 787 (citing 126 S. Ct. 2405, 2414 (2006)).

"An employee can establish a prima facie case of retaliation by proceeding under either the direct or indirect method." *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007) (citing *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006)). The defendants argue that Lewis has pursued only the indirect method of argument on appeal. However, Lewis has brought both a direct and an indirect method argument before the district court and on appeal. We conclude that Lewis succeeds in bringing her claim under the direct method.

"Under the direct method, [a plaintiff] must show '(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two.'" *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (quoting *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)). There is no dispute that Lewis satisfies the first element as she made complaints to various supervisors, the Union and the EEOC about the alleged discrimination by Williams with the IMF Detail. *See Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003) ("Usually a claim for retaliation is preceded by an obligatory complaint about discriminatory conduct, so that the employer is aware of the mistreatment and the corresponding protected activity.").

As for the second element of suffering an adverse action taken by the employer, "the discriminatory acts proscribed by Title VII's anti-retaliation provision are not limited to those that affect the terms and conditions of one's employment." *Roney*, 474 F.3d at 461 (citing *White*, 126 S. Ct. at 2412-13). But, the "challenged action must be one that a

reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Id.* Lewis has provided sufficient evidence in the record that Williams's alleged retaliatory action is such that a "reasonable employee would be dissuaded from engaging in the protected activity." *Id.* As required in reviewing a summary judgment, we must credit Lewis's competent evidence that Williams singled her out for otherwise dangerous assignments that were beyond the level of treatment she was previously receiving as an officer before she made her complaints about the IMF Detail. Additionally, Lewis provides evidence that Williams singled her out for adverse treatment about her job performance and refused a transfer in order to allow him to continue his alleged acts of retaliation.

Finally, Lewis has provided evidence of a causal connection. "[T]he mere fact that one event preceded another does nothing to prove that the first event caused the second; the plaintiff also must put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination." *Burks*, 464 F.3d at 758-59 (internal quotations and citations omitted); *see, e.g.*, *Scaife v. Cook County*, 446 F.3d 735, 742 (7th Cir. 2006) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link.") (quoting *Lang v. Illinois Dep't of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004)). There is additional evidence in the record beyond suspicious timing. Most notable is the apparently active steps taken by Williams after Lewis made her discrimination claim. Williams allegedly directed Lewis to more dangerous assignments via the police radio after her discrimination claims. This is an alleged change in Williams's actions that occurred after Lewis's discrimination claims against Williams. Williams did not

personally direct Lewis to an assignment via the radio prior to the discrimination claim. This is sufficient to survive summary judgment on this issue.

### C.  Monell Claim Against the City

Lewis's § 1983 claim against the City must be evaluated under *Monell v. Dep't of Social Servs. of the City of New York*, and its progeny. 436 U.S. 658 (1978). Misbehaving employees are responsible for their own conduct, "units of local government are responsible only for their policies rather than misconduct by their workers." *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007); *see, e.g.*, *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("A municipality may not be held liable under § 1983 based on a theory of respondeat superior or vicarious liability.") (citing *Monell*, 436 U.S. at 694).

"To establish liability, [Lewis] must produce evidence of '(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the final force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Phelan*, 463 F.3d at 789 (quoting *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997)).

Lewis's first argument against the City is that it had an express policy discriminating against women for the IMF Detail as set forth in Chief Maurer's memorandum. However, "[o]nly those individuals with the requisite policymaking authority are capable of establishing 'official policy' as required by *Monell*." *Chortek v. City of Milwaukee*, 356 F.3d 740, 748-49 (7th Cir. 2004) (citing *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.3d 1316,

1324-25 (7th Cir. 1993)). Lewis does not provide any evidence to demonstrate that Chief Maurer has policy making authority sufficient to bind the City in this case. Lewis is not suing Chief Maurer for his alleged discriminatory actions in implementing the IMF Detail but instead seeks to hold the City liable. As she has failed to demonstrate that Chief Maurer can create liability for the City, we must reject this argument.

We must also reject Lewis's second argument that the City has a widespread practice of ignoring allegations of gender discrimination and unlawful retaliation. "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." *Phelan*, 463 F.3d at 789 (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)). Lewis has failed to present evidence of a widespread practice by the City of ignoring gender discrimination and retaliation. Failing to meet her burden, the district court properly entered judgment in favor of the City on Lewis's *Monell* claim.

## III.  CONCLUSION

The judgment of the district court as to Lewis's *Monell* claim against the City of Chicago is AFFIRMED. The judgment of the district court as to Lewis's Title VII claims against the City and § 1983 claim against Williams is REVERSED. The case is REMANDED to the district court for additional proceedings consistent with this opinion.

No. 06-2302                                                    19

A true Copy:

    Teste:


                       _____
                       *Clerk of the United States Court of*
                       *Appeals for the Seventh Circuit*