In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2943

SHARON A. LUCERO,

*Plaintiff-Appellant,*

*v.*

NETTLE CREEK SCHOOL CORPORATION, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-CV-0266—**Richard L. Young**, *Judge.*

ARGUED APRIL 10, 2009—DECIDED MAY 29, 2009

Before BAUER, FLAUM, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff Sharon Lucero taught English to 12th grade students during the 2003-04 school year. In the summer of 2004, she was assigned to teach English to 7th graders instead. Following her reassignment, Lucero filed discrimination charges against her school system, its administrators, and members of the school

board of trustees. Lucero brought eleven separate claims. The district court granted summary judgment for defendants on all claims. Lucero appealed, and we now affirm.

## I. Background

The Hagerstown, Indiana Junior-Senior High School ("Junior-Senior High School") is a public school that serves students in grades 7 through 12 in one building. The Junior-Senior high school is part of the Nettle Creek School Corporation ("School Corporation"), which is governed by a seven-member board of trustees. At all relevant times, Joe Backmeyer was the superintendent of the School Corporation. Mark Childs was the principal of the Junior-Senior High School, and Bill Bunger was the assistant principal.

In 2001, Lucero, a female of Hispanic national origin, interviewed for a position in the English Department at the Junior-Senior High School. Lucero was certified to teach English to students in grades 6 through 12, and during her employment interview Childs informed Lucero that she could be assigned to teach English in any grade at the Junior-Senior High School. Childs recommended to the board of trustees that the School Corporation hire Lucero, which it did. In August 2001, Lucero entered into a written teacher's contract for the 2001-02 school year. Lucero became a member of the Nettle Creek Classroom Teachers Association. A collectively bargained agreement between that association and the School Corporation governs the terms and conditions of Lucero's employment.

For the 2001-02 school year, Childs assigned Lucero to teach 7th grade English, Yearbook, and Newspaper

courses. Lucero's performance review for that year was positive, and the school renewed her contract for the 2002-03 school year. In 2002-03, Lucero taught 8th grade English, Yearbook, and Newspaper. Her performance for that year was reviewed positively as well, and the School Corporation renewed her contract for 2003-04.

For 2003-04, Junior-Senior High School administrators decided to offer for the first time an Honors/Advanced Placement English course to Seniors. Lucero requested that Childs assign her to teach the new Honors/AP course as well as an additional English 12 course. Childs granted this request, and for the 2003-04 school year, he assigned Lucero to teach English 12, Honors/AP English, Yearbook, and Newspaper. In the summer of 2003, in preparation for the Honors/AP course, Lucero attended a three-day workshop at Ball State University. She also attended a "High Schools that Work" conference that summer.

Childs commenced teaching English 12 and Honors/AP English in Fall 2003. In November 2003, Childs observed Lucero in the classroom, which was a customary component of the annual teaching performance evaluation. Childs included his observations in a teacher visitation report. In his report, Childs noted that, in his opinion, Lucero did not use her classroom time efficiently. He noted one particular incident in which he felt Lucero spent an inordinate amount of time answering a student's question, during an interviewing skills exercise, that she "share something deep" about herself. Rather than ask the student a follow-up question to more precisely pinpoint the focus of the request, Lucero spoke for approximately ten minutes about

a 1994 incident in which she and her husband were stopped by police. She opined: "What was that all about? To us it was about discrimination. But it could have been due to us having Texas plates, and state road 70 being a drug pipeline. . . . The cop viewed it one way and we viewed it another." Childs met with Lucero to discuss his report. During the discussion, Childs questioned Lucero as to why Lucero embarked on a ten minute dialogue. He continued: "The interviewer asked only one broad question and received much information. To use this as an opportunity to model the assignment you need to make the interviewer ask you more questions in order to get information. Most students will not 'run' with one question as you were able to do." During the meeting, Lucero alerted Childs that two male students had made inappropriate remarks to her, including "Dirty Mexican" and "Is this how they do it in Mexico?" Although Lucero did not believe that Childs adequately addressed these remarks, she did not fill out a disciplinary referral form, and she "handled [the situation] within the classroom."

In December 2003, members of Lucero's Honors/AP class met with Childs to complain that Lucero assigned a paper that she required them to complete in a short time period that coincided with several semester exams. Childs responded by defending Lucero and telling students that they would be able to complete the assignment if they used their time efficiently.

In Spring 2004, a parent of a student in Lucero's Honors/AP class complained to Childs about the number of points Lucero was attributing to a certain portfolio project.

Childs suggested that the parent contact Lucero directly to try to resolve the parent's complaint. Lucero and the parent spoke but were unable to reach a resolution to the disagreement, and they ultimately "agreed to disagree," according to Lucero. Also in Spring 2004, an entire class of students met with Lucero and complained that her instructions were unclear. Lucero denied the complaint and stated that she gave clear instructions. In May 2004, some of Lucero's students and their parents voiced additional concerns to Childs regarding Lucero's teaching practices.

On May 6, 2004, during Lucero's English 12 class, student Jacob Brockman held up a photograph of student Garrett Fisher's naked buttocks to the class (the "Fisher-Brockman incident"). Lucero immediately wrote a referral regarding the Fisher-Brockman incident to assistant principal Bunger. She discussed the referral with Bunger on the next day. She told Bunger she would try to handle the matter on her own, but she asked if she could turn the referral form into him if she decided she was uncomfortable handling the incident. Bunger responded, "Yes, put them in my mailbox." On May 10, Lucero notified Bunger that she wanted him to handle the Fisher-Brockman incident. Bunger told Lucero he would investigate her referral after he completed some expulsion matters.

On May 13, Childs informed Lucero he had received an email alleging that she had allowed a cell phone with a picture of a penis to be passed around her classroom. Lucero denied the accusation, and nothing ever came of the incident.

After learning of the cell phone allegation, Lucero emailed Bunger, stating that she "would really like the

[Fisher-Brockman incident] taken care of as soon as possible." She expressed concern that if the administration did not respond soon, "those seniors will think that they can get away with anything . . . ." Lucero also sent an email to Childs, complaining that the administration had not yet addressed the Fisher-Brockman incident; that the credibility of the School Corporation's policies was at risk; and that the School Corporation was not supporting her efforts to maintain a classroom environment conducive to learning. Lucero sent a follow-up email to Childs approximately thirty minutes later, in which she again complained about the "lack of enforcement of school policy" regarding the Fisher-Brockman incident and stated that she "wish[ed] to avoid being accused of allowing sexual harassment to fester in [her] classroom as well."

On May 17, Lucero was teaching a class in the school's computer lab. Fisher walked into the lab and informed a friend that Lucero had turned him in for his role in the Fisher-Brockman incident. Lucero overheard Fisher's conversation. After Lucero asked him to leave her classroom three times, Fisher announced, "I'm leaving." The entire incident lasted approximately thirty seconds. Lucero referred Fisher to Bunger's office for discipline.

On May 18, Bunger notified Lucero by email that students "X" and "Y" (Fisher and Brockman) were suspended from school for two days for their involvement in the Fisher-Brockman incident.

On May 19, three students placed 20 Playboy magazines in Lucero's classroom. Lucero reported the incident to Bunger. Following the Playboy incident, Lucero emailed

Backmeyer, Childs, Bunger, and Deborah Brogan, the president of the Nettle Creek Classroom Teachers Association, noting that she considered the Playboy incident to be "harassment of a teacher." She stated that "pranks are common, but the types of issues that are surfacing condone a negative and hostile environment for women." On that same day, Bunger informed Lucero that the three students involved in the Playboy incident received out-of-school suspensions. The students then apologized to Lucero and told her they did not mean to hurt her. They stated that they only placed the magazines in her classroom because she had been absent from work the day before and "they couldn't resist."

On May 25 (the Seniors' last day of school), Lucero emailed Childs and Bunger to inform them that toward the end of class Fisher had asked her, "How come you turned in my photo? . . . It was no big deal." In her email, Lucero expressed frustration at what she perceived as the administration's failure to view the Fisher-Brockman incident and her subsequent confrontation with Fisher in the computer lab as more than mere childish pranks. At the end of the email, Lucero stated, "I consider what Garrett Fisher did to me in the computer lab harassing. It is harassment. . . . This is a complaint I am submitting to the office and there is only one day left in school to handle it." Several days later, Bunger informed Lucero that he counseled Fisher in response to her complaint.

At the end of the school year, Childs informed Lucero that he was not sure she had the personality to teach English to Seniors, and he was considering reassigning her.

On June 4, 7, and 9, 2004, Childs, Brogan, Lucero, and English Department Chairperson Kent Gray participated in a series of meetings regarding Lucero's next teaching assignment. During those meetings, Childs informed Lucero that her pacing in Senior English was problematic and that he had received several complaints from parents and students about problems in her classroom during the 2003-04 school year. Childs also told Lucero that her personality and teaching style were not conducive to teaching Seniors, and that she was better suited to teaching Junior High students. Lucero responded that Childs was moving her because she had asked him "to do something about" the Fisher-Brockman and Playboy incidents. Lucero also asked whether bias may be a factor, and reminded him of the derogatory remarks made by two students, including the "Dirty Mexican" remark. Childs did not respond to her inquiry. Childs told Lucero that he would not reassign her from teaching Seniors unless he could find someone who had Advanced Placement training or was otherwise more qualified to teach the Senior courses.

Brogan told Childs that if he did reassign Lucero, the teachers association and Lucero would consider the reassignment a formal "reprimand." The collective bar-gaining agreement provides that "[r]eassignment and/or transfer of an employee shall be made on the basis of qualifications."

Superintendent Backmeyer then posted a position for an English teacher. Childs interviewed Aaron Chester, a white male, for the position. At that time, Chester had never taught a Senior English course, and he did not have

experience teaching Honors or AP courses. On June 30, 2004, Childs and Backmeyer decided that they wanted to hire Chester as an English teacher at the Junior-Senior High School because: (a) he had four years' experience teaching high school-aged students in other Indiana high schools and had established a good rapport with those students; (b) he had positive employment references from two other school corporations; (c) he had a passion for British litera-ture; (d) he had a pleasant, courteous, calm, and confident personality; and (e) he was technologically savvy in the classroom. On July 14, Backmeyer recommended to the board of trustees that it hire Chester as an English teacher, and the board approved this recommendation.

On the same day that it hired Chester, the board renewed Lucero's teaching contract for the 2004-05 school year. On July 28, Childs informed Lucero in writing that he had decided to assign her to teach 7th grade English, as well as Yearbook and Newspaper, and that Chester would teach English 12 and Honors/AP English for the 2004-05 school year. Lucero would not lose any pay, benefits, or privileges as a result of her reassignment to 7th grade English.

On July 29, 2004, Lucero filed a discrimination charge with the Equal Employment Opportunity Commission, alleging gender and national origin discrimination and retaliation. She claimed that she was reassigned from English 12 to English 7 because of her gender and in retaliation for complaining about the alleged hostile work environment created by students in her Senior English classes. On September 15, 2004, Lucero filed a second charge of discrimination with the EEOC, alleging the

School Corporation retaliated against her because Childs met with her to discuss her tardiness to a meeting and warned her that future attendance issues could result in discipline. The EEOC ultimately dismissed both charges.

On August 4, Lucero, in conjunction with the teachers association, filed a grievance under the School Corporation's "just cause and appeal policy," which prohibited the School Corporation from "reprimanding" a teacher without just cause. Lucero sought reinstatement to her position as teacher of English 12 and Honors/AP English. On November 5, 2004, Lucero's grievance went to an arbitration hearing. The arbitrator dismissed the grievance on the basis that her teaching reassignment was not a reprimand and was not arbitrable.

On November 10, 2004, Backmeyer recommended that the School Corporation repeal the just cause and appeal policy because he felt the teachers association had misused the policy. Prior to making his recommendation, Backmeyer discussed the matter with a teachers association discussion team, as required by the collective bargaining agreement. That same day, the board repealed the policy at issue.

In December 2004, Lucero received a "summative evaluation form" from Childs. In that document, Childs noted that Lucero, as primarily a 7th grade teacher, had made progress in many areas, including her use of instructional time and her ability to motivate her students.

On January 26, 2005, Lucero filed a civil lawsuit against her employer in the Wayne County, Indiana circuit court. The lawsuit challenged the decision to reassign her to teach

7th grade English for the 2004-05 school year instead of Senior English courses. Lucero challenged her teaching reassignment under several legal theories, including retaliation, discrimination, hostile work environment, and breach of contract. Lucero alleged that she had incurred about $1,630 in medical bills since 2003 for treatment for physical and emotional stress as a result of defendants' retaliatory actions. She alleged she incurred additional financial harm obtaining training to teach Seniors. On February 24, 2005, defendants removed the civil rights suit to federal district court in Indianapolis, Indiana.

On March 29, 2007, defendants filed a motion for summary judgment with respect to all of Lucero's claims. After receiving extensions of time for her to respond to this motion, Lucero filed a "motion for leave to file brief in excess of thirty-five pages," which the district court granted. On August 17, 2007, Lucero filed a brief that was 147 pages in length. Lucero also attached 245 tabbed exhibits to the brief. On December 18, 2007, the district court entered an order sua sponte striking Lucero's response brief and ordering her to file an amended response brief not to exceed 50 pages in length. On March 10, 2008, Lucero filed her amended response brief. On July 3, 2008, the district court granted summary judgment in favor of defendants on all of Lucero's claims. Lucero appealed the district court's ruling with respect to her claims for retaliation, discrimination, hostile work environment, and breach of contract, and she appealed the district court's decision to strike her initial response brief.

## II. Analysis

We review a district court's ruling on summary judgment de novo, construing facts and drawing inferences in the light most favorable to the non-moving party. *Cooper-Schut v. Visteon Automotive Sys.*, 361 F.3d 421, 425 (7th Cir. 2004). Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### A. Retaliation Claims

Lucero appeals on her retaliation claims. In her retaliation claims, Lucero claims defendants violated Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a)) and Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681(a)) by retaliating against her for complaining about alleged discrimination. To prevail on her retaliation claims, Lucero must establish that she suffered a materially adverse employment action. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The district court found that Lucero had not submitted sufficient evidence to create a genuine issue of material fact as to whether her reassignment to teach English primarily to 7th grade students, instead of 12th grade students, was a materially adverse employment action. As a result, it granted summary judgment in favor of defendants on these claims. The parties focus their retaliation-related arguments on this dispositive question.

We examine this question in light of the Supreme Court's decision in *Burlington*. In that case, Burlington had hired

Sheila White as a railroad "track laborer," a job that entailed removing and replacing track components, transporting track material, cutting brush, and clearing litter and cargo spillage from the right-of-way. Some facets of that job involved operation of a forklift. White was soon assigned to operate the forklift, and while she also performed some of the other track laborer chores, operation of the forklift became her primary responsibility. After she complained to Burlington officials about sexual harassment by her male supervisor, however, White was relieved of forklift duty and assigned to perform only other track laborer tasks. *Id.* at 57-58. She sued, asserting a claim of retaliation, and a jury found in her favor, concluding that her reassignment was a materially adverse employment action. The district court denied a posttrial motion by Burlington for judgment dismissing White's claim as a matter of law. *White v. Burlington Northern and Santa Fe Ry. Co.*, No. 99-2733 M1/BRE, 2000 WL 35448693 (W.D. Tenn. Nov 16, 2000). The Sixth Circuit initially reversed the judgment, but the full appeals court vacated the panel decision, heard the matter en banc, and affirmed the district court's judgment in White's favor. *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 803 (6th Cir. 2004).

The Supreme Court heard the case to clear up a circuit split as to the standard for when a reassignment of duties is a materially adverse action. The Court cautioned that "reassignment of job duties is not automatically actionable," and that the standard for assessing such a reassignment is an objective, rather than a subjective, one. *Id.* at 71. The Court stated that "materially adverse" in this context

means "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). "[P]etty slights, minor annoyances, and simple lack of good manners" are normally not sufficient to deter a reasonable person. *Id.* The Court further stated that whether an action is materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 69 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)).

Applying the law to the case in front of it, the Court rejected Burlington's contention that the reassignment of White could not be considered materially adverse because her "former and present duties f[e]ll within the same job description." *Id.* at 70. The Court concluded: "[H]ere, the jury had before it considerable evidence that the track labor duties were 'by all accounts more arduous and dirtier'; that the 'forklift operator position required more qualifications, which is an indication of prestige'; and that 'the forklift operator position was objectively considered a better job and the male employees resented White for occupying it.' Based on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." *Id.* at 71 (quoting *Burlington*, 364 F.3d at 803) (internal citations omitted).

Turning to our case, Lucero argues on appeal that her 2004-05 job reassignment was an adverse action because

her teaching reassignment would dissuade reasonable teachers from making or supporting a charge of discrimination (and, she argues, her reassignment actually did dissuade other teachers from bringing discrimination charges) and teaching English 7 is less prestigious than teaching Seniors. To support her argument that her teaching reassignment has dissuaded teachers from making a charge of discrimination, Lucero submitted affidavits from colleagues that state that Lucero's reassignment has dissuaded other discrimination charges. However, the same individuals that filed the affidavits have been involved in making and supporting discrimination charges on Lucero's behalf since the reassignment, demonstrating that they were not in fact dissuaded. More to the point, unlike the employee in *Burlington*, Lucero was not reassigned to a position consisting of objectively less desirable duties. She continued to teach the same academic subject in the same building and under the same conditions after her reassignment. In fact, her reassigned duties were the same teaching duties she successfully performed for all but one year of teaching for the School Corporation. She did not suffer a cut in pay, benefits, or privileges of employment when she was assigned to teach English 7 for the 2004-05 school year.

Lucero's effort to create an issue of fact as to an adverse employment action by asserting that her 2004-05 teaching assignment was less prestigious than her previous assignment fails. The Supreme Court in *Burlington* did reference "prestige" once, when it stated the "forklift operator position required more qualifications, which is an indication of prestige." Here, there's no evidence that a 12th

grade English teacher has more qualifications than a 7th grade teacher. While Lucero may subjectively believe that teaching High School students is more prestigious than teaching Junior High students, her personal preference is not sufficient to establish an adverse action. As defendants point out, if personal preference alone was sufficient to establish adverse employment action, the objective requirement for such a finding would effectively be eliminated and federal employment law would become a mechanism for enforcing employee preferences rather than remedying materially adverse treatment. From an objective standpoint, Lucero's reassignment from 12th grade English teacher to 7th grade English teacher would not dissuade a reasonable teacher from bringing a discrimination charge against defendants, as required by *Burlington*. No reasonable employee would see her reassignment as materially adverse. The district court's grant of summary judgment in favor of defendants on Lucero's retaliation claims was proper.

### B.  Discrimination Claims

In her discrimination claims, Lucero alleges that defendants discriminated against her on the basis of her sex, race, color, and natural origin. She brings these claims under Title VII, Title IX, and 42 U.S.C. § 1981. Similar to her retaliation claims, to succeed on her discrimination claims Lucero must demonstrate a materially adverse employment action that resulted from the alleged discrimination to survive summary judgment. *Lewis v. City of Chicago*, 496 F.3d 645, 652-53 (7th Cir. 2007). We have noted that materi-

ally adverse employment actions that result from discrimination "can be categorized into three groups of cases involving: (1) the employee's current wealth such as compensation, fringe benefits, and financial terms of employment including termination; (2) the employee's career prospects thus impacting the employee's future wealth; and (3) changes to the employee's work conditions including subjecting her to 'humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in [her] work place environment.'" *Id.* at 653 (quoting *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002)).

Lucero argues that she suffered a materially adverse employment action that resulted from the alleged discrimination. While Lucero's compensation, benefits, and workplace environment remain unchanged, she claims that the reassignment damaged her career prospects because teaching Seniors and Honors/AP English requires more training than teaching 7th grade, and because she is now a "floater teacher" assigned to English 8 and to monitor study halls in addition to teaching English 7, making her more susceptible to a reduction in force and less attractive to other school districts.

Lucero lacks proof for her argument that teaching Senior English, including Honors/AP English, requires more specialized training than teaching 7th grade English. In addition to her own testimony, Lucero attempts to rely upon the affidavits of her advocates and colleagues. Although Lucero's affiants assert that teaching Seniors requires more specialized training, they lack objective

evidence to support their opinions. We do not doubt that a teacher, to succeed in teaching 7th graders, must employ different skills than she would employ to successfully teach 12th graders. Each grade level calls for certain unique, specialized skills in teachers. We cannot conclude that teaching Seniors requires *more* specialized training.

Lucero's attempt to create an adverse employment action by labeling herself a "floater teacher" also fails. She argues she is a floater teacher because she has taught 8th grade English and study hall in addition to 7th grade English since her reassignment. She continues that this designation makes her more vulnerable to a reduction in force. However, Lucero, like the other English teachers in the Junior-Senior High School English Department, is under contract simply as a "teacher." Her teaching contract does not designate her as a "floater teacher." Lucero has been employed under the same terms and conditions, including the same title, since her employment commenced with the School Corporation. Moreover, pursuant to the policies of the School Corporation, reductions in force are determined on the basis of certification, seniority, proficiency in teaching performance, and length of experience in assigned subject area. Lucero's seniority and teaching certification are not impacted by her teaching assignment. Lucero has demonstrated proficiency in teaching Junior High English courses and has taught these courses for all but one year of her teaching career in defendants' employ. It seems unlikely that her teaching reassignment increased her chance of being reduced. Nor did the reassignment diminish her attractiveness to other school districts. Lucero has not submitted evidence to show a materially adverse

employment action resulting from the alleged discrimination, and her discrimination claims do not survive summary judgment.

### C. Hostile Work Environment Claims

Lucero next alleges that the district court erred when it granted summary judgment on her Title VII and Title IX hostile work environment claims. She argues that defendants subjected her to a hostile work environment because they maintained a policy and practice of deliberate indifference to instances of known or suspected sexual and racial harassment by students, and that this policy and practice created a climate which facilitated sexual and racial harassment toward her by the students.

To establish a prima facie case of ethnic origin and/or sexual hostile environment, Lucero must show that because of her gender or ethnic origin: (1) she was subjected to unwelcome harassment; (2) the harassment was based on her ethnic origin or sex; and (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007) (Title VII case); *Mary M. v. North Lawrence Comm. Sch. Corp.*, 131 F.3d 1220, 1228 (7th Cir. 1997) (Title IX case). Under Title IX, there is only a basis for liability when the employer has been deliberately indifferent to the harassing conduct. *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 288-93 (1998). In order for a plaintiff to recover the employer must act "intentionally . . . by remaining deliberately indifferent to acts . . . of which it had actual knowledge."

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999).
Under Title VII, an employer can avoid liability for hostile
environment sexual harassment if it promptly investigates
a complaint when made and then, if warranted, "takes steps
reasonably likely to stop the harassment." *Saxton v. AT&T*,
10 F.3d 526, 536 (7th Cir. 1993).

Lucero asserts administrators created a hostile work
environment by "ridiculing" her May 2004 complaints
related to the Fisher-Brockman and Playboy incidents and
by being too lenient in their responses to these complaints.
There is no doubt that the students involved in the Fisher-
Brockman and Playboy incidents conducted themselves in
an extremely inappropriate manner. No teacher should be
subject to the deplorable behavior described in the facts of
this case. Still, these were isolated incidents that were
neither sufficiently severe or pervasive to rise to the level
of actionable harassing conduct. *Ngeunjuntr v. Metro. Life
Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) ("Relatively
isolated instances of nonsevere misconduct will not
support a claim of a hostile environment"). In addition,
there is no evidence to suggest that the students targeted
Lucero because of her gender or national origin.

Furthermore, there does not seem to be a basis for em-
ployer liability with respect to these incidents because
Bunger and Childs investigated Lucero's referrals and
disciplined the students involved in the incidents. The
students involved in the Playboy and Fisher-Brockman
incidents were suspended from school, and Fisher was
counseled by Bunger for his separate conduct in the com-
puter lab. Although Lucero may disagree with the disci-

pline imposed, her disagreement is subjective and does not establish unreasonableness or deliberate indifference.

Lucero alleges that the students' "Dirty Mexican" and "Is this how they do it in Mexico?" remarks also created a hostile work environment. With respect to the comments made by the students, Lucero testified that she did not refer those students for discipline for uttering those comments and "handled the situation in the classroom" pursuant to the School Corporation's discipline policy. There is no evidence that such comments were uttered more than once. These comments were not sufficiently pervasive so as to alter the conditions of Lucero's working environment.

Lucero also points to Childs' "criticism" of Lucero's ten minute in-class response to a student's question in which she discussed the time she and her husband were stopped by a policeman, which she attributed to the fact that they looked "Mexican." The evidence reflects that Childs' criticism of her racial profiling story was not racially oriented. Childs merely critiqued her teaching style in an interviewing skills exercise.

We conclude that Lucero's allegations of hostile work environment fail as a matter of law. Under both Title VII and Title IX, she cannot establish a prima facie case of harassment.

### D. Contract Claims

Lucero contends the defendants breached the collective bargaining agreement by violating certain policies promul-

gated by the board of trustees. First, she alleges that defendants breached the collective bargaining agreement because Childs failed to mention problems when he conducted Lucero's annual teacher evaluation and failed to give her an opportunity to correct any problems by placing her on a job improvement plan after the evaluation. The teacher evaluation policy provides that a teacher with two or more years of experience shall be evaluated at least once during the school year. Childs did evaluate Lucero once during the 2003-04 year. The problems which precipitated her eventual transfer, and of which she now complains she did not have an opportunity to "correct," did not arise until the Spring, after her evaluation was completed. These problems could not have been part of the evaluation, and there is no requirement that a teacher be evaluated twice in a year. Further, the job improvement target provision is only triggered "[i]f the evaluator determines that the teacher's performance is below the corporation's standard of acceptable performance." Because Lucero's problems did not come to a head until after her evaluation, defendants did not violate these policies.

Lucero also argues that defendants violated their "public complaint policy" because some of the parent and student complaints were not initially referred to her to resolve. However, this policy is a personnel policy and not part of the collective bargaining agreement or Lucero's teacher contract and an alleged violation of it cannot be pursued as a breach of contract. *See Orr v. Westminister Village North, Inc.*, 689 N.E.2d 712, 720-21 (Ind. 1997).

Next, Lucero claims defendants breached their "anti-harassment policy." The anti-harassment policy

provides that "[i]t is the policy of the [board] to maintain an education and work environment which is free from all forms of unlawful harassment, including sexual harassment." The board is directed to "vigorously enforce" the policy by investigating allegations of harassment "and in those cases where unlawful harassment is substantiated, the Board will take immediate steps to end the harassment." Here, the evidence reflects that Bunger and Childs did investigate Lucero's disciplinary referrals and suspend the students involved in misconduct. Therefore, this claim lacks merit.

Lucero claims that defendants violated the "reassignment policy" because there was no evidence that she was not qualified to teach Senior English, and she was more qualified to teach English 12 and Honors/AP English than was her replacement, Chester. The policy dealing with reassignment reads: "Reassignment and/or transfer of an employee shall be made on the basis of qualifications. Employees who have requested transfer shall be notified in writing of the administrative action taken." This language seems to grant the administration discretion to reassign teachers based upon qualifications. In this case, a vacancy was listed for a teacher for the English Department for grades 7 through 12. Childs interviewed Chester and determined he was better suited to teach Senior English, and that Lucero was better suited to teach English 7. This decision seems reasonable. Lucero has not demonstrated a genuine dispute of material fact as to any of her breach of contract claims.

### III.  Conclusion

Based on the evidence in the record, summary judgment in favor of defendants was proper on Lucero's retaliation, discrimination, hostile work environment, and breach of contract claims. Moreover, the district court did not abuse its discretion in striking Lucero's first brief in response to defendants' motion for summary judgment. We AFFIRM the decision of the district court.