In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-3844 & 11-1104

VERONICA DASS,

*Plaintiff-Appellant*,

*v.*

CHICAGO BOARD OF EDUCATION, *et al.*,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 6045—**David H. Coar**, *Judge.*

ARGUED OCTOBER 25, 2011—DECIDED APRIL 12, 2012

Before EASTERBROOK, *Chief Judge*, HAMILTON, *Circuit Judge*, and MYERSCOUGH, *District Judge*.[*]

MYERSCOUGH, *District Judge.* Veronica Dass brought this action against Paula Jeske, the Chicago Board of

---

[*] Of the Central District of Illinois, sitting by designation.

Education (Board), and the Chicago Public Schools[1] (CPS) after the Board accepted Jeske's recommendation that Dass not be renewed for the 2007-2008 school year and sent Dass notice that her employment would terminate on August 24, 2007. Dass alleged that: (1) the Board and CPS discriminated against her on the basis of her national origin and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* (Title VII); (2) the Board and CPS discriminated against her in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.*; and (3) Jeske discriminated against her based on her national origin in violation of 42 U.S.C. § 1981. Dass also brought various state-law claims.

The district court granted defendants' motion for summary judgment with respect to the federal claims and declined to exercise supplemental jurisdiction over the state-law claims. Dass appeals only from the district court's entry of summary judgment against her on her claims of national origin discrimination under Title VII and § 1981. For the reasons that follow, we affirm.

## BACKGROUND

The district court compiled a detailed and comprehensive factual history of this case which can be accessed

---

[1] The Chicago Public Schools is not a suable entity. Therefore, we amend the caption of this case to reflect that the Chicago Board of Education is the proper justiciable party.

at *Dass v. Chicago Pub. Sch.*, No. 08 C 6045, 2010 WL 4684034 (N.D. Ill. Nov. 12, 2010). Neither party contends the district court's recitation of the facts is inaccurate.[2] More- over, while Dass proceeded under both the direct and indirect methods of proof before the district court, Dass's attorney stated during oral argument that Dass was "not proceeding under the indirect method here." Dass's submissions to this court on appeal confirm her attorney's representation as those submissions make no mention of the indirect method and only address her direct method theory. Dass has thus abandoned her indirect method theory. *See Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (claim pursued before district court but not raised in briefs submitted on appeal was abandoned).

Dass taught a fifth-grade class at Pablo Casals Elemen- tary School (Casals) during the 2005-2006 school year. Because of an error by the Board's Human Resources Department, Dass was displaced after that school year when Casals lost teaching positions due to budget con- straints. After Dass won her grievance, the Board rein- stated her and she was assigned to teach a seventh-grade class at Casals even though a third-grade class was open. Dass requested and received medical leave in December 2006. She did not return the rest of the school

---

[2] While Dass has not argued the district court's recitation of the facts was incorrect, Dass maintains the district court ignored the requirement of Rule 56 of the Federal Rules of Civil Procedure that the evidence be viewed in the light most favorable to the nonmovant.

year. In the spring of 2007, Jeske recommended to the Board that Dass be non-renewed for the 2007-2008 school year. The Board accepted the recommendation and informed Dass that her employment would terminate in August 2007.

Dass is very specific as to what evidence she claims is direct evidence of national origin discrimination. Because we assume the parties' familiarity with the district court's opinion, and for the sake of brevity, we recount only those facts surrounding Dass's proposed direct evidence of discrimination and those additional facts necessary to our analysis of Dass's direct method theory and our holding.

## I. *Facts Predating the 2005-2006 School Year*

Dass was born in Hyderabad, India. The Board first hired Dass as a teacher in 1991. In 2002, Dass was hired at Casals. At the time the Board hired Dass to teach at Casals, Dass had a Type 03 teaching certificate from the State of Illinois, which allowed her to teach any grade between kindergarten and eighth grade.

Dass taught second grade during the 2002-2003 school year, and third grade during the 2003-2004 and 2004-2005 school years. Aleen Donaldson was the principal at Casals during this time. While Donaldson rated Dass's overall performance on her annual teacher evaluations during these years as "excellent," Donaldson never recommended Dass for tenure. Donaldson testified at her deposition that Dass "was never really a strong disci-

plinarian." Donaldson testified Dass was not strict or consistent in her discipline. Donaldson thought it was possible to be a strong teacher, but not a strong disciplinarian.

Donaldson retired after the 2004-2005 school year. However, before Donaldson retired, she non-renewed Dass for the 2005-2006 school year. Dass lost her teaching position but reapplied to teach at Casals for the 2005-2006 school year. Dass was rehired and assigned to teach the fifth grade. Casals had an interim principal for several weeks at the beginning of the 2005-2006 school year until Jeske became principal in September 2005.

## II. *Jeske's 2005-2006 Evaluations of Dass*

Jeske conducted three formal observations of Dass's performance in the classroom during the 2005-2006 school year. Those observations took place on January 10, April 28, and May 16, 2006.

After Jeske's January 10, 2006 observation of Dass, Jeske checked the "strength column" in 27 out of 30 applicable categories on the Classroom Teacher Visitation Form. While the district court referred to Jeske's evaluation of Dass's performance as "generally positive," Jeske's deposition testimony shows that a checkmark in the strength column did not necessarily mean the teacher being observed was doing well in that category. Jeske testified a checkmark on the left side of the strength column meant the teacher was "doing a real good job in all those areas." However, a checkmark on the right side

of the strength column indicated "[t]hat you are not doing so well in that. You need to work on it." Many of the checkmarks in the "strength column" appear to be on the right side of the column on the performance form for Dass. Jeske also noted on the form that Dass needed "to improve classroom management so lessons are actively participated in by students."

The Classroom Teacher Visitation Form that Jeske completed following the April 28, 2006 observation of Dass's classroom reflected far more negatively on Dass's performance than the January 2006 review did. Jeske marked many more weaknesses than before. Additionally, Jeske noted that the "English lesson on sentences is fragmented" and that "kids were shooting rubber bands, dancing, talking, out of seats, drawing [and] brushing hair."

Jekse observed Dass on May 16, 2006, and gave Dass another negative review. Jeske's notes following this observation indicated there were 22 children present in class, but only 7 were following along with Dass, that three boys were up throwing paper balls, a boy and girl were hitting each other, one boy was fanning himself with a book, two boys were making paper animals, one boy was sitting backwards on his chair, and one girl was doing her hair. Dass did not reprimand any of them.

Finally, Jeske gave Dass an "unsatisfactory" rating on her annual evaluation at the conclusion of the 2005-2006 school year. Jeske thought that Dass had poor classroom management and that most of the students were off task during class. Moreover, Dass frequently had to refer

students for discipline. Finally, Jeske noted that Dass did not follow suggestions made by the administration.

Dass admitted she experienced difficulty in managing and disciplining students. However, Dass denied that her disciplinary problems were more abundant than those experienced by other teachers.

### III. Incidents Dass Claims Are Direct Evidence of Discrimination

Dass sets forth the following evidence as direct evidence she was discriminated against based on her national origin: (1) Jeske's alleged statement telling Dass to look for a teaching job on the North Side where most of the Indian kids go; (2) Jeske's vehement opposition to Dass's grievance; (3) Jeske's refusal to assign Dass to an open third-grade class and instead assigning her to a seventh-grade class; and (4) Jeske's decision to send her assistant principal to formally observe and report on Dass, three times in one day, shortly after Dass started teaching the seventh-grade class.

#### A. Jeske's Alleged Statement

Jeske met with Dass several days after the April 28, 2006 observation to discuss the evaluation of Dass. Dass testified that during this meeting Jeske stated that Dass should start looking for a job "on the North Side where most of the Indian kids go." Jeske denies making the comment, but on review of a grant of sum-

mary judgment against Dass, we must accept Dass's testimony as true.

### B. Jeske's Opposition to Dass's Grievance

Each year, a list of teachers that are classified as a probationary assigned teacher (PAT)[3] is sent to all principals so that the principals can decide which PATs they wish to retain and which they wish to non-renew. The Board's Human Resource Department (HR Department) erroneously misclassified Dass as a temporary assigned teacher (TAT)[4]. Therefore, Dass did not appear on the list of PATs sent to Jeske in the spring of 2006. Declining student enrollment projections for the 2006-2007 school year cost Casals six teaching positions. Dass was one of the six teachers displaced by Human Resources because of being erroneously misclassified as a TAT rather than a PAT. Jeske had no role in the misclassification of Dass as a TAT or the displacement that resulted from that misclassification.

---

[3]  A PAT is a full-time teacher serving the probationary period set forth in 105 ILCS 5/34-84. Teachers in their first, second, or third year of probationary service could be terminated without reason at least 30 days before the end of the school year. Teachers in their fourth year of probationary service must be given a reason for termination at least 30 days before the end of the school year.

[4]  Generally, a TAT is assigned to temporarily fill a position that is vacant due to an appointed teacher taking leave.

Dass filed a grievance challenging the misclassification and displacement. While Jeske eventually learned Dass had been erroneously classified as a TAT, Jeske still objected to Dass's return to Casals. In Jeske's view, if it were not for the misclassification of Dass, Jeske could have non-renewed Dass in the spring of 2006. Jeske sent several emails to the Board's HR Department in which she indicated her desire that Dass not be returned to Casals. One email stated, "If Dass is truly a PAT I should have been able to simply non-renew her. Believe me I have tried everything possible to do so." Another email stated, "I have the Department of Justice breathing down my back and need to hire a Spanish bilingual teacher before my November 1 audit." Dass contends that these comments, combined with Jeske's alleged comment that Dass should teach on the North Side where the Indian kids go to school and her vigorous opposition to Dass being rehired at Casals, show Jeske's discriminatory intent. The Board agreed that Dass had been misclassified and should be returned to Casals.

## C. *Jeske's Decision to Assign Dass to a Seventh-Grade Rather than Third-Grade Class*

Upon Dass's return to Casals in November 2006, Jeske assigned Dass to teach a seventh-grade class, even though there was an open third-grade class. That seventh-grade class had been taught by Carla Miller from August 2006 until September 2006 and Erin Yost, who took over the class from Miller and taught it until Dass's November 2006 reinstatement and assignment to the class.

When Dass returned, Jeske reassigned Yost to the open third-grade class.

Dass alleges that Jeske manipulated the situation by reassigning Yost to the third grade so that Jeske could assign Dass to the seventh-grade class, which Dass alleges had proven itself to be very difficult to discipline. Dass opines that Jeske, knowing that Dass had trouble with discipline while teaching a fifth-grade class during the 2005-2006 school year, assigned Dass to the seventh-grade class so Dass would be more likely to fail than if she were assigned to the teach the third grade—a grade Dass argues she excelled at teaching in prior years.

Jeske offered several reasons for assigning Dass to the seventh-grade class rather than to the open third-grade class.[5] Among Jeske's reasons were that: (1) even before Dass was reinstated at Casals, Jeske had planned on moving Yost to the third grade and requesting a teacher with a bilingual Spanish endorsement to teach the seventh grade so that Casals could comply with an upcoming audit; (2) input she received from Lead Literacy Teacher, Renee Mackin, indicated Dass had serious problems when she previously taught third

---

[5] Jeske also decided not to return Dass to a fifth-grade class that had started the 2006-2007 school year without a regular teacher. The class had been covered by a substitute teacher. However, before Dass returned, Jeske hired a new teacher specifically for the fifth-grade class. Dass does not contend she should have been assigned to the fifth-grade class.

grade; (3) Yost, who Jeske considered a much stronger teacher than Dass, was needed in third grade because it is a "bridge" year, or critical testing year,[6] and seventh grade was not; and (4) Yost had been trained in DIBELS and Reading First, two new programs for kindergarten through third grade that Dass had not been trained in (according to defendants, the Casals administration did not view Dass as a good candidate for the Reading First Program given Dass's lack of training in the DIBELS assessment that corresponded with the program and her difficulty in maintaining order in her classroom). Further, at her deposition, Jeske was asked whether any consideration was given as to what was best for the seventh-grade class when assigning Dass and reassigning Yost. Jeske responded, "Yes, I needed a teacher that had qualification to teach science, and Mrs. Dass is highly qualified in science, in physical science, general science, and biological science." Jeske also stated that she decided a "primary grade assignment would be more appropriate for" Yost. Some of the male students in the seventh-grade class had made inappropriate comments of a sexual nature to Yost.

In response to Jeske's explanations, Dass pointed out that Yost had never taught the third grade before. More-

---

[6] At her deposition, Jeske testified that "bridge" grades (in Chicago, the third, sixth, and eighth grades) are important because a child will have to go to summer school if they do not receive at or above "a particular cut score" on the ISAT. If the child does not reach that score after summer school they have to repeat the grade.

over, Yost had discipline issues in the classroom and struggled with classroom management. In her response to defendants' statement of uncontested facts, Dass also claimed that Yost was not trained in the Reading First Program until after she was reassigned to the third grade at Casals.

We note that Yost was not renewed after the 2006-2007 school year. At her deposition, Jeske testified she did not renew Yost "because in [seventh] grade, she didn't have much success. And I knew that the next year, whoever was going to come back, was going to have [seventh] grade. She did a pretty good job or a better job, I would say, in [third] grade than she did in [seventh], but I need seventh grade teachers, so I didn't renew her either." Of further note is the fact that after Dass took a medical leave of absence in December 2006, a Ms. Provost took over Dass's seventh-grade class on a full-time substitute basis. Jeske did not renew Ms. Provost after the 2006-2007 school year.

### D. Jeske's Direction to Her Assistant Principal to Observe Dass Three Times in One Day

Dass returned to teach at Casals at some point during the first half of November 2006. Defendants claim it was November 6 or 7, 2006, while Dass states it was no earlier than November 13, 2006.

On November 16, 2006, assistant principal Bennie Bonaminio conducted three observations of Dass's classroom, at 10:04 a.m., 10:55 a.m., and 12:52 p.m. At his

deposition, Bonaminio could not recall why he returned to the classroom for additional observations but stated, "I would think that I was asked to return to the classroom by the Principal[.]" Dass alleges that Jeske took the unusual step of having Bonaminio observe her classroom so quickly after Dass started because Jeske knew Dass would have trouble with discipline in the seventh-grade class and Jeske wanted to send her assistant principal to observe and record the problems Jeske knew Dass would have.

Bonaminio stated that in his experience as an assistant principal, most evaluations of teachers tended to take place at the end of the school year. Bonaminio had never performed an evaluation within the first two weeks of a semester. However, beginning with the 2006-2007 school year, principals could make formal observations of teachers at any time during the school year. Prior to the 2006-2007 school year, principals could not make a formal observation of a teacher until at least the 20th school day of the year.[7]

---

[7] While not within the first two weeks of Yost's assignment to the seventh-grade class, Jeske did make an evaluation of Yost's performance during the short time she was teaching the seventh-grade. The evaluation noted that "classroom management must improve for lessons to be effective and that Yost needed to work on daily routines and consistency."

*IV. Dass's Performance as a Seventh-Grade Teacher During the 2006-2007 School Year*

During Bonaminio's first visit he noted in the "Comment" section of the Classroom Teacher Visitation Form that Dass's classroom lacked control, that school security had been called to the class twice that day prior to his first visit, that students were walking around the classroom and were using inappropriate language, that few students were actively working on an assignment, and that they seemed to lack direction or purpose. Bonaminio's written narrative following the second visit noted that the classroom seating arrangement had not been established and a student moved around from table to table, students were working on various assignments at one time without any clarity from Dass as to what was supposed to be completed, students spoke out of turn in class without being corrected, students argued with Dass, and Dass had not established any classroom routines for students. The written narrative following the third visit to Dass's classroom stated that students were out of their seats, were making noises and yelling out continually, seats were overturned, the classroom was littered with paper, the classroom library was in disarray, only a small percentage of students were doing any work, and the students were laughing and making jokes all afternoon. Dass admits that these observations accurately reflect what happened in her classroom on November 16, 2006. However, Dass points out this was "the third or fourth day of [her] being there."

Dass testified that Jeske observed her performance on November 21, 2006. When Jeske walked in, the class was in total mayhem and the classroom was littered with books on the floor because Dass's students had been throwing them at each other that morning. Some of Dass's students were playing with their MP3 players and others were sitting in groups. None of the students were responding to Dass's efforts to direct them back into their assigned seats. According to Dass, Jeske did not try to find out what was going on in the classroom and Jeske's presence did not stop the students from misbehaving.

Jeske also observed Dass on November 29, 2006. She visited Dass's classroom three times that day and noted the following in her written narrative: "On three separate visits to class, each time children were writing definitions and answering questions from the text. [Dass] offered no instruction, explanation or assistance to the students. Most of the students were off task. During one class, only two students were doing the assigned work. At one point[,] six kids were wandering around the classroom at will." Jeske further noted that kids were frequently sent out of class for Band-Aids and Kleenex. When Dass was dismissing the class in the stairwell, only three students were with her and the rest had wandered off. Jeske and Dass met on December 1, 2006 to discuss the evaluation. Dass refused to sign to acknowledge receipt of the evaluation form because she believed she was being treated unfairly, and Jeske allowed the students to view her written observations that were critical of Dass.

Renee Mackin, who had been assigned by Jeske to help struggling teachers, visited Dass's class at least once a week to model effective teaching strategies for Dass. Mackin noticed that Dass had significantly more discipline and management problems than other seventh-grade teachers. Mackin observed Dass's class and noticed the students were out of their seats, were throwing things at each other, and were not on task. Mackin gave Jeske her opinion that Dass was a weak teacher. Dass maintains she was not unique in needing and receiving assistance from Mackin.

Jose Candelario was a security guard at Casals. Candelario had spent an inordinate amount of time addressing disciplinary problems in both Dass's fifth-grade and seventh-grade classes. Other seventh-grade teachers had problems with discipline, but Candelario had more problems with Dass than other teachers.[8]

Dass admits that while she served as a seventh-grade teacher, her classroom was out of control—specifically that her students did not pay attention to her and were disruptive. Dass had difficulty managing her classroom every single day. She also admits telling Jeske on several occasions that she could not handle her teaching

---

[8] While not related to Dass's seventh-grade performance, Candelario had to station his chair outside of Dass's class-room door when she was a fifth-grade teacher because Dass's problems managing the class had gotten so severe and Candelario was called to her room much more often than to any other room.

duties as a seventh-grade teacher. Dass also told Jeske that she was unable to get her students to respond to her or follow basic directives from her. Dass explained to Jeske that the disciplinary problems were making it difficult to teach her students.

## V. Dass's Medical Leave and Eventual Non-renewal for the 2007-2008 School Year

In December 2006, Dass requested and received medical leave to be effective from December 4, 2006 until June 17, 2007. Dass began her leave on December 4, 2006, and did not return the rest of the school year. In March 2007, while Dass was on medical leave, Jeske recommended to the Board that Dass be non-renewed for the 2007-2008 school year. Board rules and policies allow for a probationary teacher on medical leave to be non-renewed as long as the non-renewal is not because of the medical leave. In April 2007, Dass received a notice from the Board that informed her that her employment would terminate on August 24, 2007. As stated, Jeske also recommended that both Yost and Ms. Provost, the teacher hired to substitute for Dass while Dass was on medical leave, as well as two other teachers, be non-renewed for the 2007-2008 school year. Yost, Provost, and the two other teachers were not of Indian origin and were all born in the United States.

The district court granted summary judgment for the defendants on Dass's federal claims. This appeal followed. We affirm.

**ANALYSIS**

*I. Legal Standard*

We review the district court's decision to grant summary judgment *de novo*. *Ashman v. Barrows*, 438 F.3d 781, 784 (7th Cir. 2006). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts are construed and all inferences are drawn in favor of the nonmovant. *Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th Cir. 2008). With this standard in mind, we turn to Dass's claim of employment discrimination based on her national origin.

*II. Dass's National Origin Discrimination Claim Under Title VII and § 1981*

Dass claims that (1) Jeske's decision to assign Dass to the seventh-grade class and (2) Jeske's recommendation to the Board to non-renew Dass for the 2007-2008 school year, and the Board's acceptance of that recommendation, were acts of discrimination based on Dass's national origin in violation of Title VII and § 1981. Discrimination claims under Title VII and § 1981 are nearly identical, and Dass treats them identically. *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011). Accordingly, we apply the same analysis to Dass's claims against Jeske and the Board.

Dass may attempt to prove her national origin discrimination claims under Title VII and § 1981 under either the

direct or indirect method. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003). Dass elected to abandon her indirect method theory on appeal and proceed under only the direct method.

Even though Dass is proceeding under the direct method, Dass still must demonstrate she suffered an adverse employment action.[9] *Lewis v. City of Chicago*, 496 F.3d 645, 652-53 (7th Cir. 2007) (citing *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) ("Whether the plaintiff proceeds by the direct or indirect method of proof, he must show a materially adverse employment action")). Therefore, before addressing Dass's direct method theory, we will address what adverse employment actions are at issue here. Dass contends she suffered two adverse employment actions. First, Dass argues the decision to non-renew her was an adverse employment action. Defendants do not dispute this. The second adverse employment action that Dass alleges she suffered was being assigned to teach

---

[9] This phrase "adverse employment action" does not actually appear in the statute. The statutory term is "discrimination." The phrase "adverse employment action" is a "judicial gloss" that "often may help to express the idea—which the Supreme Court *has* embraced—that it is essential to distinguish between material differences and the many day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms and conditions*." Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006).

seventh grade rather than third grade. Defendants, citing this court's decision in *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720 (7th Cir. 2009), argue the decision to assign Dass to teach the seventh grade was not an adverse employment action.

A.  *The Decision to Assign Dass to the Seventh-Grade Class Upon Dass's Return to Casals in November 2006 Was Not an Adverse Employment Action*

An adverse employment action must "materially alter the terms and conditions of employment." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). A materially adverse employment action is more than a mere inconvenience or an alteration of job responsibilities. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (quotation omitted).

The Seventh Circuit has articulated three general categories of actionable, materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from

using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal*, 392 F.3d at 911). Dass claims that the assignment to the seventh grade was a nominally lateral transfer that reduced her career prospects by preventing her from using her skills or experience and was a change in the conditions in which she worked that subjected her to a significantly negative alteration in her work environment. We disagree.

Defendants cite *Lucero* as support for their argument that the decision to assign Dass to teach seventh grade rather than third grade was not an adverse employment action. In *Lucero*, the plaintiff, a female Hispanic teacher, was reassigned from teaching 12th-grade English to teaching 7th-grade English. *Lucero*, 566 F.3d at 727. The plaintiff responded by bringing retaliation and discrimination claims against her school system, its administrators, and members of the school board of trustees. *Id.* at 723. The retaliation claims were brought under Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e-3(a)) and Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681(a)). *Id.* at 728. The plaintiff's discrim-

ination claims were brought pursuant to Title VII, Title IX, and § 1981. *Id.* at 730.

To prevail on the retaliation claims, the plaintiff had to establish that she suffered a material adverse employment action. *Id.* at 728. The plaintiff argued her reassignment from teaching 12th-grade English to teach 7th-grade English was an adverse employment action "because her teaching reassignment would dissuade reasonable teachers from making or supporting a charge of discrimination . . . and teaching English 7 is less prestigious than teaching Seniors." *Id.* at 729. This court rejected this argument, stating that the plaintiff's "personal preference is not sufficient to establish an adverse action." *Id.* at 730. This court went on to reject the plaintiff's argument and noted that the plaintiff "was not reassigned to a position consisting of objectively less desirable duties." *Id.* at 729. The court reasoned that the plaintiff "continued to teach the same academic subject in the same building and under the same conditions after her reassignment. In fact, her reassigned duties were the same teaching duties she successfully performed for all but one year of teaching for the School Corporation." *Id.* Moreover, the plaintiff's compensation, benefits, and workplace environment did not change. *Id.* at 730.

The *Lucero* plaintiff also had to demonstrate a materially adverse employment action that resulted from the alleged discrimination to survive summary judgment on her discrimination claim. *Id.* While the plaintiff argued her career prospects were damaged and her

attractiveness to other school districts was diminished, she did not have the evidence to support these claims. *Id.* at 730-31. The court concluded the plaintiff had not submitted enough evidence to show a materially adverse employment action. *Id.* at 731.

In the case *sub judice,* Dass does not claim a loss of prestige. Instead. Dass claims she was denied a position for which she was best suited and put in a different and more difficult position—the result of which was a significant alteration of her work environment and impairment of her ability to succeed as a teacher. Dass's appellate brief states that unlike the plaintiff in *Lucero,* "Dass has evidence her workplace changed because of her assignment to teach 7th grade instead of 3rd grade." *See* Dass's Appellate Brief, at 22. However, Dass does not list any of this "evidence." Her subjective belief that seventh grade is so much more difficult to teach than third grade such that being assigned to seventh grade altered her work environment is not sufficient to make that assignment a materially adverse employment action. Moreover, this argument ignores the fact that Dass taught fifth grade, not third grade, during the school year prior to being assigned to the seventh grade. In other words, Dass was not reassigned from the third grade to the seventh grade. She was assigned to the seventh grade after she won her grievance and came back to teach in the middle of the school year. As stated, the fact she was not assigned to her preferred class does not make this a materially adverse employment action. Under Dass's theory, if Jeske had reassigned Dass to the fifth grade upon her return, this

would also be a materially adverse employment action since Jeske knew Dass struggled with the fifth grade the year before. Such cannot be the case. Further, there is no evidence that Dass's responsibilities or pay were reduced, or that her career prospects were damaged or that her attractiveness to other school districts was diminished. Dass has not submitted sufficient evidence to raise a genuine factual issue as to whether her assignment to teach seventh grade rather than third grade was an adverse employment action resulting from alleged discrimination. That the seventh-grade class she was assigned to may have been more unruly than third-grade students does not make Dass's assignment to the seventh grade a materially adverse employment action.

Accordingly, the only adverse employment action Dass suffered was the termination. However, while the decision to assign Dass to the seventh grade was not an adverse employment action, we will consider that assignment as a part of Dass's argument, addressed below, that there was a mosaic of circumstantial evidence of discrimination.

B. *Dass Has Not Provided Sufficient Circumstantial Evidence of Discrimination for Her Direct Method Theory of Discrimination to Survive Summary Judgment*

"Under the direct method, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). This court has

stated that direct evidence consists of either an "outright admission by the decisionmaker that the challenged action was undertaken because of the [plaintiff's national origin]" or a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal quotations and citations omitted). However, the "mosaic" language, first used by this court in *Troupe v. May Department Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), was not intended to "promulgate a new standard." *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 904 (7th Cir. 2006). As this court recently stated, "we consistently have employed [the 'mosaic'] language to articulate the principle that, for a plaintiff proceeding under the direct method to defeat summary judgment using circumstantial evidence, '[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had [taken an adverse employment action against] the plaintiff because the latter was a member of a protected class.'" *Hanners v. Trent*, No. 11-1754, 2012 WL 899062, at *7 (7th Cir. Mar. 19, 2012) (quoting *Troupe*, 20 F.3d at 737). Dass cites to no admissions of discrimination, and relies, instead, on circumstantial evidence from which she alleges the trier of fact could reasonably infer that Jeske discriminated against Dass because of her national origin.

The Seventh Circuit has recognized three different types of circumstantial evidence of intentional discrimination: (1) suspicious timing, ambiguous oral or written

statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn;[10] (2) evidence that similarly situated employees outside the protected class received systematically better treatment;[11] and (3) evidence that the plaintiff was qualified for the job in question but was passed over in favor of a person outside the protected class and that the employer's stated reason was a pretext for discrimination.[12] *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720-21 (7th Cir. 2008) (citing *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 862 (7th Cir. 2007).

The circumstantial evidence a plaintiff presents "must point directly to a discriminatory reason for the employer's action" (*Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)) and be "directly related to the employment decision." *Venturelli v. ARC Cmty. Service, Inc.*, 350 F.3d 592, 602 (7th Cir. 2003) (quotation omitted).

Here, Dass's "mosaic" includes four main pieces of evidence: (1) Jeske allegedly told Dass that she should

---

[10] This is the type of evidence the Seventh Circuit has referred to as "a mosaic of evidence." *See Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998).

[11] This is often referred to as "comparative evidence." *Id.* at 724-25.

[12] This is often referred to as "pretext evidence." *Id.* at 725.

look for another job on the North Side where most of the Indian kids go; (2) Jeske knew Dass's grievance was valid, yet vehemently opposed the grievance; (3) Jeske refused to assign Dass to the open third-grade class and instead assigned Dass to a seventh-grade class that had proved itself to be a difficult class to discipline; and (4) Jeske sent the assistant principal to observe and report on Dass three times in one day shortly after Dass started teaching the class.

The closest thing Dass has to an admission of discriminatory intent by defendants is Jeske's alleged comment that Dass should look for another job on the North Side where most of the Indians go. "A remark can raise an inference of discrimination when it 'was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action.'" *Petts*, 534 F.3d at 721 (quoting *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). However, "[t]o be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996). There is no set cut-off date "by which comments must be made in order to support a finding of discriminatory intent," rather the determination must be made after considering all of the facts. *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1115 (7th Cir. 2009). In fact, the Seventh Circuit has rejected a bright line test based on timing alone. *See Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 666 (7th Cir.

2006) ("It is worth mentioning that the district court and Wauconda were under the mistaken belief that Paz cannot proceed under the direct method because some of Li's comments were made two months prior to her firing."). Instead, how recent the comments were made is only one of several factors that are considered when determining whether there was sufficient circumstantial evidence from which the trier of fact could infer discrimination. *Id.* ("Yet, how recent the comments were, how extreme, and who made the remarks are pieces of evidence that inform whether there was a 'mosaic of discrimination.' ").

Here, Jeske's alleged comment about seeking a job on the North Side was made in May 2006—about 10 months before Jeske recommended that Dass be non-renewed for the 2007-2008 school year. The comment was not contemporaneous to or causally related to the discharge. Moreover, no rational juror could find that the non-renewal was because of Dass's national origin, even if the remark had been closer in time. There is no doubt that Jeske wanted to get rid of Dass, but Dass's evidence does not create a genuine factual issue as to whether Jeske was motivated by national origin discrimination rather than Dass's admitted inability to maintain discipline. The undisputed facts show that Dass was non-renewed because she could not control her class, a class within the range of grades she was certified to teach and to which Jeske had the discretion to assign her. Clearly, the alleged comment could not have been related to the decision to non-renew Dass. This comment is there-

fore insufficient to point directly to a discriminatory reason for Dass's non-renewal.[13]

Dass's other pieces of evidence in her "mosaic" likewise do not point directly to a discriminatory reason for her non-renewal. Dass contends that in addition to the alleged comment, Jeske's opposition to Dass's grievance, refusal to assign Dass to the third grade, and decision to have Dass's classroom observed shortly after she started create a chain of evidence from which the inference must be drawn that Dass was non-renewed because of her national origin. However, the circumstantial evidence must "point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). None of Dass's proposed evidence points directly to discrimination on the basis of national origin.

---

[13] We also note that Jeske also non-renewed four non-Indian teachers. One of the teachers, Ms. Yost, taught Dass's seventh-grade class up until Dass was reinstated in November 2006. After Dass's reinstatement and assignment to the seventh grade, Jeske reassigned Ms. Yost to teach the same third-grade class that Dass desired to be assigned to. Another teacher Jeske non-renewed was Ms. Provost. Ms. Provost substituted for Dass after Dass went on medical leave.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.

AFFIRMED