In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2314

MICHAEL A. TERUGGI,

*Plaintiff-Appellant*,

*v.*

THE CIT GROUP/CAPITAL FINANCE, INC.,
d/b/a CIT RAIL,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:11-cv-00216—**Ronald A. Guzman,** *Judge*.

ARGUED NOVEMBER 30, 2012—DECIDED FEBRUARY 21, 2013

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*.  Michael A. Teruggi alleges that his former employer discharged him in retaliation for filing a workers' compensation claim and because of his age and disability. To support his claims, Teruggi offers what he perceives to be a "convincing mosaic of circumstantial evidence." His former employer argues that the termination was the result of Teruggi's failure to protect

confidential information belonging to the company's suppliers, in violation of its code of conduct.

The district court granted summary judgment in the employer's favor, finding that Teruggi's mosaic of circumstantial evidence was less than convincing. We agree. To survive summary judgment, Teruggi must offer evidence that allows a reasonable factfinder to infer that his employer discriminated against him because of his age or disability or retaliated against him as a result of his workers' compensation claim. The bits of evidence Teruggi offers, which are essentially isolated events or comments with no apparent connection to the termination decision, do not support a reasonable inference of discrimination or retaliatory discharge, either individually or collectively. Therefore, we affirm.

## I. BACKGROUND

Michael Teruggi, an Illinois resident, worked for the CIT Group d/b/a CIT Rail ("CIT"), a Delaware corporation, out of its Chicago facility from July 1997 until his discharge in February 2009. Throughout his employment with CIT, Teruggi held the title of vice president.

In April 2002, Teruggi suffered a workplace injury to his right hand. In 2006, doctors amputated the little finger on his right hand and removed the connecting bones to his wrist. CIT's health insurance carrier disagreed with CIT's workers' compensation carrier over responsibility for the medical bills. At the encouragement of Joanna Spano, a member of CIT's human

resources department, and George Cashman, Teruggi's supervisor at the time, Teruggi filed a workers' compensation claim in 2005 and won a settlement of $35,000 in May 2007. According to Teruggi, Cashman asked Teruggi whether he received the settlement check around June 2007.

Following his injury, Teruggi requested accommodations at work. Because he had difficulty carrying his laptop, Teruggi asked his immediate supervisor, senior vice president Matt Shanahan, for permission to use a backup disk drive to transfer internal CIT documents to his home computer. Shanahan approved the request. In addition, Steve McClure, then president of CIT, approved Teruggi's request to transfer CIT documents and communications to his personal Yahoo! email account. But when Teruggi later asked for a left-handed keyboard, Cashman, who became CIT's president in August 2006, denied the request.

Cashman made several comments that Teruggi characterizes as discriminatory. In either 2005 or 2006, while Cashman and Teruggi were discussing Cashman's plan to retire at 55, Teruggi asked Cashman what he would do in retirement. Cashman replied that he would play golf and have fun. Teruggi responded, "[N]ot me. I'll be here till I'm 70 if I'm a day." In 2006, Cashman sent a memo to all CIT salespeople that ended with the sentence, "I'm sure everyone will understand my thought process with the exception of Teruggi since he's OLD." At an August 2007 customer event, Cashman, Teruggi, and their wives were socializing when the conversation

turned to the fact that Teruggi "loves his job, and since his hand injury, he can't play golf, this is all he does . . . ." (It is not clear from the record who made this statement.) Cashman then asked how much longer Teruggi would work, and Teruggi responded that he would work until he was 70. And during a January 2009 meeting with CIT salespeople and new employees, Cashman rejected a proposal Teruggi made and remarked that Teruggi was "back on drugs."

In 2007, CIT created a senior vice president and general manager position to oversee locomotive leasing and maintenance of the locomotive fleet. After CIT's senior management team interviewed Dan DiStefano, who worked at Siemens Transportation Group, and other candidates, it offered DiStefano the position. Because DiStefano was not a United States citizen, however, CIT was required to post the position internally before he could accept it.

Teruggi applied for the new position after CIT offered it to DiStefano, but Cashman, who considered Teruggi to be a salesperson rather than a business leader, was skeptical of Teruggi's qualifications for the position. Cashman also noted that Teruggi had "excessive interpersonal" conflicts with employees in two of the departments the new senior vice president would oversee. Nonetheless, following CIT's policy of interviewing all internal candidates, Cashman, Shanahan, and others interviewed Teruggi over several days in August 2007. The company then again offered the position to DiStefano, who accepted it.

In February 2008, Teruggi received an email sent by a CIT employee announcing the promotion of Richard Latini, a former CIT employee who worked for a competitor. The subject line was "Competitive Information," and the email was labeled as "high" importance. Within minutes of receiving the email, Teruggi forwarded it to Latini, who was a friend of his. When CIT senior vice presidents, including DiStefano, learned that someone had forwarded an internal email outside the company, they grew concerned. Suspecting that Teruggi sent the email, Cashman ordered Susan Kiefer, vice president of human resources, to monitor Teruggi's work email account.

Kiefer, concerned that Teruggi was sharing "confidential, proprietary, highly sensitive" information that would be useful for the company's competitors, focused her monitoring on emails Teruggi sent to recipients not connected to CIT or to his personal account. Kiefer did not know why Teruggi sent emails to a personal account, and Shanahan, who had previously authorized Teruggi to use various means to transfer documents, had left the company by this time. Kiefer conveyed her concerns about Teruggi's emails to DiStefano, Cashman, senior vice president of human resources Tessie Massa, and in-house counsel. Because they did not know what Teruggi was doing with the documents, they instructed Kiefer to continue monitoring his account. She did so for nearly a year.

In August 2008, CIT's chief counsel sent an email to all personnel reminding them of code of conduct require-

ments regarding confidential information. The email included the directive: "[f]or avoidance of any uncertainty, you should not email proprietary information to any non-CIT email address or retain copies for your personal files." Despite this warning, Teruggi continued to send emails to his personal account, including documents about freight car leasing, although the primary focus of his job was locomotive leasing.

On January 16, 2009, David Nahass from Railroad Financial, which specializes in financing rail projects, requested information from Teruggi about the number of new locomotive units delivered to CIT in 2008 and the number projected for 2009. Nahass had first requested this information from John Cavanaugh, director of marketing administration for Electro-Motive Diesel ("EMD"), which supplied locomotives to CIT. Upon learning that Cavanaugh was out of the office, he sent the request to Teruggi. That day, Teruggi sent an email to James Schnabel of EMD, saying that he was "being asked by our NY folks how many new locomotives were built in 08 and what is the projection for 09." On January 21, Schnabel sent Teruggi the production estimates along with a confidentiality notice that stated, in relevant part, "This email and any files transmitted with it are confidential and/or copyrighted material of Electro-Motive Diesel, Inc." Teruggi forwarded Schnabel's email to Nahass that day and the following day, he sent it to Lawrence Beal, president of National Railway Equipment Company, a locomotive rebuilding and manufacturing company. Teruggi did not inform Schnabel that he would share the information with anyone out-

side of CIT before doing so. On January 20, Cavanaugh responded to Nahass's original request, although with numbers that were different from—and according to CIT, more generic than—the ones Teruggi provided.

Kiefer discovered Teruggi's emails to Nahass, Schnabel, and Beal on January 27, during the course of her regular monitoring of Teruggi's work email account. She conferred with DiStefano, who first tried to replicate the data from publicly available industry reports and then concluded that the information was confidential to EMD. Kiefer then conferred with Cashman, Massa, and in-house counsel. Cashman contacted CIT personnel based in New York and was unable to confirm that any New York CIT employee requested this information. Massa and Kiefer then determined that an internal auditor should investigate the matter, with Massa assisting the auditor because Kiefer was leaving the country for vacation. As a part of the half-day investigation, the auditor interviewed Cashman, DiStefano, and Teruggi. At the conclusion of the investigation, Massa recommended to Cashman that Teruggi be discharged due to violations of the code of conduct including failure to protect confidential information of suppliers like EMD. Cashman decided to discharge Teruggi but delayed the termination until February 3, 2009, so that Teruggi could receive his 2008 bonus. Teruggi was 59 years old at the time of his discharge.

In 2010, Teruggi filed a lawsuit against CIT in state court, alleging age and disability discrimination in violation of the Illinois Human Rights Act ("IHRA"), 775 Ill.

Comp. Stat. 5/1-101 et seq., as well as retaliatory discharge, a common-law tort in Illinois. After CIT removed the case to federal court, Teruggi amended his complaint and added claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq. The district court granted CIT's motion for summary judgment on all claims, and Teruggi filed a timely notice of appeal.

## II. ANALYSIS

The issue before us is whether Teruggi has presented evidence sufficient to raise a genuine issue of material fact as to whether CIT terminated his employment based on his age, disability, or workers' compensation claim. After reviewing the record, we determine that he has not.

### A. The Evidence Does Not Support an Inference of Age or Disability Discrimination

A party alleging discrimination under the ADA, ADEA, or IHRA may proceed under the direct or indirect method of proof and may rely on circumstantial evidence to meet his burden. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (ADEA); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (ADA); s*ee Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989) (age discrimination claims under the IHRA should be analyzed in the same way as ADEA claims); *see also Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 14 (Ill. App.

Ct. 1989) ("When analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to analogous federal claims."). Teruggi has chosen to use the direct method with circumstantial evidence. To survive summary judgment on his claims under the ADA, ADEA, and IHRA, he must offer evidence from which an inference of discriminatory intent can be drawn, such as: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). A party may combine these various types of evidence to present a "'convincing mosaic' of circumstantial evidence" from which a factfinder can make a reasonable inference of discriminatory intent. *Rhodes v. Ill. Dep't. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)); *but see Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 9900, 904 (7th Cir. 2006) ("But it was not the intention in *Troupe* to promulgate a new standard, whereby circumstantial evidence in a discrimination or retaliation case must, if it is to preclude summary judgment for the defendant, have a mosaic-like character."). Teruggi's evidence consists of events that began with his 2005 workers' compensation claim and 2007 settlement and that concluded with his 2009 discharge, including

Cashman's comments, the "sham" interview for the senior vice president position, the company's decision to monitor his email account rather than counsel or discipline him, and the hasty investigation into his alleged misconduct. This evidence falls far short of what is necessary to support a reasonable inference of age or disability discrimination.

To be convincing, Teruggi's evidence "must point directly to a discriminatory reason for the employer's action . . . and be directly related to the employment decision." *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012) (internal quotation marks and citation omitted). Teruggi's evidence does not point to discrimination. Rather, he has offered "an amorphous litany of complaints about a myriad of workplace decisions." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). For example, he expresses frustration over CIT's decisions to interview him after offering the senior vice president position to DiStefano, to monitor his email account for nearly a year without informing him, and to discharge him for what he believes is an inconsequential violation of company policy.[1] Yet these

---

[1] Teruggi's recitation of relevant facts includes other avenues he may have pursued, for example, failure to accommodate (based on Cashman's denial of his request for a left-handed keyboard) and failure to promote (based on the senior vice president position that went to DiStefano). But Teruggi has identified the termination decision as the relevant adverse employment action. And even if he had advanced a failure

(continued...)

complaints do not point to discriminatory intent, either individually or collectively. We know nothing about DiStefano's age or disability status to support an inference that CIT wanted him in the senior vice president position because he was younger than Teruggi or not disabled. And the company's decision to monitor Teruggi's work email for over a year rather than discipline him for sending emails to his personal email account does not hint of discrimination. Neither, for that matter, does Teruggi's argument that the company should not have fired him for what he perceives to be a minor violation of company policy because the supplier later disclosed the same information. At best, Teruggi's evidence calls into question the wisdom of Cashman's discharge decision. But we are not ultimately concerned with whether CIT made the *right* decision when it terminated Teruggi's employment; rather, we focus our inquiry on whether Teruggi has presented evidence from which a factfinder can make the reasonable inference that CIT made a *discriminatory* decision based on Teruggi's age or disability.

To the extent that Teruggi argues that CIT's reason for discharging him is pretextual, his evidence does not support that inference. An unwise employment decision does not automatically rise to the level of pretext; rather, a party establishes pretext with evidence that the em-

(...continued)

to accommodate or promote action, the evidence in the record is plainly insufficient to support either of these claims.

ployer's stated reason or the employment decision "was a lie—not just an error, oddity, or oversight." *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010). And none of Teruggi's evidence shows that Cashman's stated reason for Teruggi's discharge was a lie. Even if Teruggi's evidence showed pretext, that alone would not be sufficient to survive summary judgment under the direct method. *Van Antwerp*, 627 F.3d at 298 ("Evidence offered under the direct method 'must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus.'" (quoting *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003)).

The strongest pieces of Teruggi's mosaic that could point to age or disability discrimination are Cashman's comments about Teruggi's retirement plans, being "old," and being on drugs, but even those are not sufficient either alone or when combined with the rest of the evidence to point to a discriminatory motive. To raise an inference of discrimination, comments must be "(1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). Although Cashman made the decision to discharge Teruggi, the comments he made about Teruggi's age and disability predated the termination decision by at least eighteen months and were not in reference to the adverse employment action. And to the extent that one might interpret Cashman's January 2009 statement that Teruggi was

"back on drugs" as related to either Teruggi's age or his disability, there is no apparent connection between that comment and the termination decision.

Ultimately, the evidence that Teruggi presents is either irrelevant or insufficient to lead to a reasonable inference of discrimination. *See Gorence*, 242 F.3d at 763 ("And it is simply not true, we want to emphasize, that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero.").

### B.  The Evidence Does Not Support an Inference of Retaliatory Discharge

To establish retaliatory discharge under Illlinois common law, a plaintiff must show that he was "(1) discharged; (2) in retaliation for [his] activities; and (3) that the discharge violates a clear mandate of public policy." *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009) (quoting *Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d 909, 911 (Ill. 1988)). The Illinois Supreme Court has held that a plaintiff satisfies the third prong "when an employee is discharged for filing, or in anticipation of the filing of, a claim under the Workers' Compensation Act." *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 493 (Ill. 1998). And because CIT terminated Teruggi's employment, the only issue that remains is causation—that is, whether the discharge was in retaliation for Teruggi's workers' compensation claim. As with his discrimination claims,

Teruggi may rely on circumstantial evidence to meet his burden of proof. *Jackson v. Bunge Corp.*, 40 F.3d 239, 242 (7th Cir. 1994).

Teruggi relies on the same evidence for his discrimination and retaliatory discharge claims. That evidence is no more convincing for the latter than it is for the former. Teruggi filed his workers' compensation claim in 2005, more than three years before his discharge. And although he argues that his discharge was in retaliation for the $35,000 settlement he won in May 2007, the settlement predated the termination by more than eighteen months. And without any connection between the claim and his termination, this timing is not at all suspicious. *See Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." (citations omitted)). Furthermore, Teruggi pursued the workers' compensation claim at the urging of Cashman, who made the discharge decision, and a member of CIT's human resources department. While it is entirely possible that a supervisor may encourage an employee to file a claim for workers' compensation and then turn around and discharge that employee for doing so, no evidence presented by Teruggi suggests that occurred here.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.